**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| **KEITH JACKSON, *et al.*,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No.: 3:09-cv-54** |
| **BECCM COMPANY, INC, *et al.*,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## JOINT PRETRIAL ORDER

COME NOW Keith Jackson ("Jackson"), by and through his counsel, and BECCM

Company, Inc., BECCM Enterprises, LLC, and Brent Wright, by and through their counsel, and,

pursuant to this Court's September 9, 2009 Pretrial Order, files the instant joint pretrial order that

addresses each point ordered by the Court.

I.      **Essential Elements of Outstanding Claims**

        **A. Keith Jackson's Claims**

            **1. Failure to Pay Regular and Overtime Wages Under the FLSA**
              **a. Elements**

                i.     Whether Defendants Wright and BECCM Enterprises are Jackson's employers subject to the FLSA for the time period involved (the parties stipulate that BECCM Company, Inc. was Jackson's employer).

                ii.    Whether Jackson's return trip travel to Defendants' business location was compensable work time. (Counsel disagree as to when travel becomes compensable work time).

                iii.   The amount of unpaid compensation due and owing if Defendants failed to pay Mr. Jackson the minimum wage and/or overtime pay for all time worked.

b.    **Damages and/or Relief Sought**

    i.     Judgment against the Defendants in the amount of economic damages and liquidated damages to be determined at trial;

    ii.    A reasonable attorney's fee and the costs of this action;

    iii.   Any other relief this Honorable Court deems just and proper to award.

## 2.  Discrimination Based Upon Race Under Title VII
### a.  Elements

    i.  Whether Jackson is a member of a protected class;

    ii.  The Defendant failed and/or refused to give the Plaintiff a raise based on Plaintiff's declining to not vote for Barack Obama for President; and

    iii.  The Plaintiff's race was a motivating factor for the Defendant's action.

### b.  Damages and/or Relief Sought

    i.  Legal and/or equitable relief as will effectuate the purposes of 42 U.S.C. §2000(e) *et seq.* including, but not limited to:

        A.  Economic damages;

        B.  Compensatory damages;

        C.  Reasonable attorney's fees;

        D.  Court costs; and

        E.  Any other relief that this Court deems just and equitable.

## 3.  Hostile Work Environment Based Upon Race Under Title VII
### a.  Elements

1.  Whether Jackson is a member of a protected class

2.  Whether Jackson was subjected to harassment, either through words or actions, based on race;

3.  Whether the harassment was so severe or pervasive that a reasonable person in Jackson's position would find Jackson's work environment to be hostile or abusive;

4.  Jackson believed his work environment to be hostile or abusive as a result of the harassment;

5.  Whether there exists some basis for liability on the part of the employer.

**b. Damages and/or Relief Sought**

    i. Legal and/or equitable relief as will effectuate the purposes of 42 U.S.C. §2000(e) *et seq.* including, but not limited to:
  - A. Economic damages;
  - B. Compensatory damages;
  - C. Reasonable attorney's fees;
  - D. Court costs; and
  - E. Any other relief that this Court deems equitable.

**4. Retaliation Based Upon Opposition to Racial Discrimination**
    **a. Elements**

    i. Whether Jackson engaged in protected activity;
    ii. Whether BECCM subjected Jackson to an adverse employment action; and
    iii. Whether a causal connection existed between the first two elements.

    **b. Damages and/or Relief Sought**

    i. Legal and/or equitable relief as will effectuate the purposes of 42 U.S.C. §2000(e) *et seq.* including, but not limited to:
  - A. Economic damages;
  - B. Compensatory damages;
  - C. Reasonable attorney's fees;
  - D. Court costs; and

**5. Harassment**
    **a. Elements**

    1. Whether Jackson was intentionally subjected to unwelcome harassment by Defendants;

    2. Whether that the harassment was based upon his race;

    3. Whether the harassment was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and Mr. Jackson in fact did perceive it to be so; and

    4. Whether the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive working environment.

### b.  Damages and/or Relief Sought

i.  Legal and/or equitable relief as will effectuate the purposes of 42 U.S.C. §2000(e) *et seq.* including, but not limited to:
   A.  Economic damages;
   B.  Compensatory damages;
   C.  Reasonable attorney's fees;
   D.  Court costs; and

## B.  BECCM Company's Claims

### 1.  Conversion
   #### a.  Elements
   i.   Plaintiff wrongfully exercised dominion or control over BECCM Company, Inc.'s  property, thereby depriving BECCM Company, Inc. of possession of the property.
   #### b.  Damages and/or Relief Sought
   The loss of value to the vehicles.

## II.    CLAIMS: MATERIAL FACTS

### A.  Plaintiffs Proffered Facts

Defendant BECCM Company, Inc. and BECCM Enterprises, LLC are for-profit businesses incorporated in the Commonwealth of Virginia, and they conduct a business of providing and installing various glass products.  BECCM Company has gross revenues in excess of $500,000.00 per annum and is an enterprise engaged in commerce, as such terms are defined in the FLSA.  BECCM Company is an "employer" engaged in an "industry that affects commerce."  Defendant Brent Wright is the president and director of BECCM Company, Inc., and BECCM Enterprises, LLC.  BECCM Company is an employer subject to the requirements of the FLSA.

Defendant BECCM Company, Inc. directly employed Mr. Jackson from on or about January 9, 2008, through February 13, 2009, during which time he worked as a lead glass installer for Defendants.  As part of his duties and responsibilities Mr. Jackson was required to

drive to and from jobsites to install glass for Defendants' customers.  Defendants added a

Gordonsville office in addition to their Charlottesville offices in approximately late November or

early December, 2008.

Throughout Mr. Jackson's employment with Defendants BECCM Company, Inc.,

BECCM Enterprises, LLC, and Brent Wright, Defendants required Mr. Jackson to transport his

co-workers to and from Defendants' offices and their worksites at the beginning and end of each

work day in company owned trucks or vans.  From on or about January 9, 2008, through late

November or early December, 2008, Defendants BECCM Company, Inc., BECCM Enterprises,

LLC, and Brent Wright required that Mr. Jackson meet his coworkers and supervisor at a traffic

circle in Gordonsville or that he report directly to Defendants' offices in Charlottesville prior to

proceeding to the worksite to which he was assigned for the day.  It was at these locations where

Mr. Jackson would leave his personal vehicle and pick up a company vehicle.  Mr. Jackson and

his co-workers would also receive instructions for the work to be performed that day at these

meetings, and they would receive additional supplies and tools that they would then carry to the

worksite in the company vehicles.

From on or about January 9, 2008, through late November or early December, 2008, at

the end of the day, Defendants BECCM Company, Inc., BECCM Enterprises, LLC, and Brent

Wright required Mr. Jackson to return to either the traffic circle in Gordonsville or Defendants'

offices in Charlottesville to return the vehicle and the extra supplies and company equipment that

he used during the day at the work site.  However, Mr. Jackson was not compensated for this

return trip even though Defendants required Mr. Jackson to report to them the time at which he

left the work site in the afternoons and they benefitted from Mr. Jackson transporting his co-

workers and from him bringing the vehicle, extra supplies and equipment back to either the

traffic circle in Gordonsville or Defendants' offices in Charlottesville.

From late November or early December, 2008, through on or about February 13, 2009, Defendants BECCM Company, Inc., BECCM Enterprises, LLC, and Brent Wright required Mr. Jackson to report to Defendants' office in Gordonsville each day prior to proceeding to the worksite to which he was assigned for the day. It was at this location where Mr. Jackson would leave his personal vehicle and pick up a company vehicle. Mr. Jackson would check in and he and his co-workers would also receive instructions for the work to be performed that day at this daily meeting, and they would receive additional supplies and tools that they would then carry to the worksite in the company vehicles.

From late November or early December, 2008, through on or about February 13, 2009, Defendants BECCM Company, Inc., BECCM Enterprises, LLC, and Brent Wright required Mr. Jackson return to Defendants' offices in Gordonsville at the end of the day to drop off his co-workers and to return the vehicle and the extra supplies and company equipment that he used during the day at the work site. Mr. Jackson would also occasionally unload window frames that needed to be repaired. However, Mr. Jackson was not compensated for this return trip even though Defendants required Mr. Jackson to report to them the time at which Mr. Jackson left the work site in the afternoons and they benefitted from Mr. Jackson transporting his co-workers and from Mr. Jackson bringing the truck, extra supplies and equipment back to the Defendants' offices in Gordonsville.

For a short period in or about the fall of 2008, Defendants BECCM Company, Inc., BECCM Enterprises, LLC, and Brent Wright permitted Mr. Jackson to drive a company truck or van home at night and to work in the morning for a period of approximately three weeks. When Defendants permitted Mr. Jackson to drive the truck or van home at night, during those three

weeks, Mr. Jackson did not report back to Defendants' offices or to the Gordonsville traffic circle. Instead, Mr. Jackson drove directly work in the morning and directly home from his worksite at night.

On two other occasions while Mr. Jackson was driving the company's truck, Mr. Jackson drove straight home from his worksite instead of driving back to Defendants' offices after he concluded work for the day. On the first occasion in roughly March, 2008, Defendants permitted Mr. Jackson to drive the company's truck home because his truck broke down. On the second occasion, in roughly April, 2008, Defendants permitted Mr. Jackson to drive the company's truck home because he had some more problems with his truck and needed to go to the auto parts store in Orange, Virginia. On that occasion, Defendants permitted Mr. Jackson to drive the company's truck to the auto parts store and then to my home for the night.

Mr. Jackson recorded his arrival time by informing Mr. Wright of the time Mr. Jackson arrived at Defendants' designated site: the Gordonsville traffic circle, Defendants' offices, or the work site. Defendants included in Mr. Jackson's hours worked the amount of travel time that it took Mr. Jackson each morning to get from Defendants' offices or the Gordonsville traffic circle to the worksite to which Defendants assigned Mr. Jackson for the day, and Mr. Jackson was paid for this travel time.

Defendants compensated its employees for their morning travel from their offices or the Gordonsville traffic circle to their worksites. Specifically, Defendants admitted that they paid their employees for their morning travel as follows:

```
                                    103
     7    Q  Why do you pay employees on the way to
     8  work and not on the way back?
     9       A  Occasionally they work in the morning.
    10  Occasionally when they come in the office, they'll
    11  get instructions, they'll carry material to a job
```

12  site.  They might need caulking.  They might need
13  vinyl.  They might need shims, the basic necessities
14  for going on a job.
15      Q  So is it your opinion or your position
16  that the time spent in the morning from when you meet
17  with them initially in Charlottesville and/or
18  Gordonsville, that is compensable time?
19      A  The time I meet with them -- I pay them
20  from the time they start working.
21      Q  When do they start working, according to
22  you?

104
1      A  When they get to work.  When they get
2  to -- if they're working at my office, then I
3  consider that work.
4      Q  Are you benefitting from it?
5      A  Am I benefitting -- is BECCM benefitting
6  from --
7      Q  From them getting there at the time --
8  whatever time they get there and start loading tools
9  on the trucks and getting instruction from you?
10      A  Yes.
11      Q  Is it in furtherance of BECCM's interests
12  that employees come and get prepared for the job at
13  the various respective job sites?
14      A  That they come and get prepared at the job
15  sites, is it what?
16      Q  Is it in BECCM's interest that employees
17  get instructions from you and get siding, like you
18  were saying, or various tools, and then head to the
19  respective job sites?
20      A  Yes.

107
20   Q  But you believe the employees are working
21  on the way out; is that correct?
22      A  I believe that the employees come to work

108
1  and start work in the morning.  When they see me, I'm
2  giving them instructions.  When they stop work at the
3  end of the day, and they want to go out to eat or go
4  wherever they want to, I'm not paying them.  They
5  stop work at whatever time they're done with work.

8

Defendants kept ladders, saws, scaffolding, generators, glass, and other materials in their offices, which their employees transported to their worksites and which their employees returned to Defendants' offices at the conclusion of their workday.

It was in Defendants' interest and to Defendants' benefit that their employees return company trucks, tools, and materials to Defendants' offices. Defendants believed that if their employees returned to their offices at the end of the day from the employees' worksites with Defendants' scaffolding, ladders, or generators that its employees were working for Defendants and should be compensated for that work. Specifically, Defendants admitted as follows:

105

```
17   Q  Does BECCM keep ladders, saws,
18  scaffolding, generators, glass, et cetera, at its
19  offices in Gordonsville?
20        A  Yes.
21           Q  Did it previously keep ladders, saws,
22  scaffolding, glass, et cetera, in its offices in
```

106

```
 1  Charlottesville?
 2        A  Yes.
 3           Q  And are those materials transported from
 4  the office to your work site in the trucks that BECCM
 5  provides to employees?
 6        A  Occasionally.
 7           Q  At the end of job duties, are ladders,
 8  saws, scaffolding, generators returned to BECCM via
 9  those same trucks?
10        A  Occasionally.
```

107

```
20   Q  But you believe the employees are working
21  on the way out; is that correct?
22        A  I believe that the employees come to work
```

108

```
 1  and start work in the morning.  When they see me, I'm
 2  giving them instructions.  When they stop work at the
 3  end of the day, and they want to go out to eat or go
 4  wherever they want to, I'm not paying them.  They
 5  stop work at whatever time they're done with work.
 6     Q  What if they're taking one of your trucks
 7  carrying one of your generators or your scaffolding
```

9

```
 8  back, are they still working for you?
 9       A  They chose to drive that truck.  They're
10  free to drive their own vehicle.
11       Q  But if they're returning at the end of the
12  day with one of your scaffolding or some of your
13  scaffolding or your ladders or your generators, and
14  they're bringing it back to your office, are they
15  still working for you?
16       A  Yes.
17       Q  In that circumstance, should they be
18  compensated?
19       A  Yes.
```

However, Defendants did not pay their employees, including Mr. Jackson, for the time they spent traveling from their worksites back to Defendants' offices at the end of the day.  Upon leaving the work site for the day, Mr. Jackson called Mr. Wright to inform him of the time at which Mr. Jackson left the work site, as Defendants required him to do.  Defendants deducted the amount of travel time that it took Mr. Jackson to get from the work site to the Gordonsville office from Mr. Jackson's hours worked.

Although Defendants paid Mr. Jackson for the amount of travel time that it took him to get from the Gordonsville office to the worksite to which Defendants assigned Mr. Jackson for the day, Defendants refused to pay Mr. Jackson for the amount of travel time that it took him to get from the work site back to the Gordonsville office at the end of the day.

Throughout Jackson's employment with Defendants, Jackson was forced to endure his colleagues' and Wright's constant racial epithets, racial insults, racial jokes, and racially demeaning comments.  Despite Jackson's objections to the hostile work environment to which he was subjected, Defendants did nothing to stop the use of the odious language that Jackson was forced to endure.  Of the approximately thirty (30) hourly employees and six (6) salaried employees working for Albermarle Glass & Mirror, Jackson and Douglas were the only African-Americans.  Throughout Jackson's employment with Defendants, Jackson's Caucasian

colleagues called African Americans generally, and Jackson and Douglas specifically, "nigger" in the context of jokes, statements, and other derogatory comments both in and out of the presence of Wright who is also Caucasian.

Jackson has estimated that the term "nigger" was used in his presence on an average of ten (10) times per month for each of the thirteen (13) months he worked at Albermarle Glass & Mirror, for a total of approximately 130 times this term was used in his presence. The derogatory comments about African Americans generally included, among numerous others:

- "Look at that nigger there;" and
- "That nigger bitch."

The jokes Jackson's colleagues told using this term included, among numerous others:

- Q: "What do you call a black man in a suit?" A: "a well-dressed nigger."
- Q: "How many niggers does it take to change a light bulb?" A: "only 1" Q: "why only one?" A: "How many dumb asses do you think it takes to change a light bulb?"
- "A white guy and a black guy enter a bar, and…"

Jackson's colleagues who were principally responsible for employing these racially-motivated terms, jokes, and comments included the following, all of whom are Caucasian: Robert Foley, Assistant; Frank Shifflett, Assistant; David McDaniel, Lead Mechanic; Richard Brown, Lead mechanic; Bill Huffman, Lead Installer; and Jamie Morris, Lead Installer. Jackson regularly complained directly to his colleagues about their use of the "n" word and these jokes and comments. Jackson's colleagues would apologize, only later to use the word again in his presence; ignore him; or laugh at him. On a few occasions, Jackson's colleagues called him "nigger" directly. For instance, in August 2008, McDaniel said to Jackson "what's up nigger?"

In response, Jackson told McDaniel that he should not refer to African Americans with that terminology and that McDaniel should not refer to Jackson that way either. Although McDaniel said "no problem," he then persisted to use the "n" word in Jackson's presence.

Jackson also directly reported his colleagues' use of the word to his supervisor, Wright. However, Wright either did nothing to stop Jackson's colleagues or laughed at the jokes himself. Further, Wright also occasionally employed the terminology himself in Jackson's presence. For example, on or around May 2008, during a conversation with Jackson at work, Wright referred to an eleven year old girl who is a member of the softball team which Wright and BECCM Company sponsors as "one lazy black bitch." Even when Jackson complained to Wright about his use of this racist terminology, he persisted in using it.

In October 2008, Wright and some of Jackson's colleagues began making a number of derogatory remarks about then presidential candidate Barack Obama, referring to him as a "nigger." Mr. Brown, Mr. Shiflett, and others frequently referred to then-Senator Obama as a "nigger" and told Jackson and Douglas that "Obama ain't going to win," and "he ain't going to help you anyway." Jackson understood that the insinuation in their comments was that just because now-President Obama is African American does not mean that he will "help" Jackson because Jackson, too, is African American. Further, Wright and Jackson's colleagues cursed now-President Obama, calling him the "n" word and complained that now-President Obama would raise taxes and ruin Wright's business.

On October 28, 2008, Wright met with Jackson and Douglas. During the meeting, Wright told Jackson and Douglas that if they did not vote for Barack Obama in the presidential elections then he would issue both Jackson and Douglas a pay raise of $1 per hour. Jackson and Douglas both refused Wright's entreaty directly and at that moment. Wright then stated that if

now-President Obama were to become President, Wright would close his business. Jackson understood that to mean that if Obama were to win, then Wright would close his business and Jackson would be out of a job. Jackson still refused Wright's entreaty and Wright never gave Jackson or Douglas the raise.

In the weeks and months immediately following this interchange, and just after the November presidential elections, Wright began assigning both Jackson and Douglas with "random days off" without explanation. Although there was work to be done, Jackson was not put on the work calendar. Further, none of Jackson's Caucasian colleagues were assigned days off following the presidential election.

Throughout this period, Wright also became more brazen in his employ of the term "nigger" in Jackson's presence. For instance, on December 4, 2008, Jackson called Wright for his morning check-in. When Wright was transferred the call, he answered the phone saying "what's up nigger?" Jackson could hear Wright and others in the background laughing. Jackson then replied "excuse me?" Wright, laughing, stated "I mean, what's up Keith?" Jackson was upset and speechless after this incident. Jackson could not believe that Wright had not only failed to ever curtail Jackson's colleagues' use of this word around and to Jackson, but Jackson was appalled that Wright was using it directly at Jackson as well.

On another occasion, on February 5, 2009, Jackson traveled with Wright to a jobsite for work. During the trip, Wright made a series of racist remarks, referring to the African American boyfriend of his sister-in-law (who is Caucasian) as a "no good nigger." Wright further stated that the "worthless nigger don't do shit!" and then concluded that "I don't hate black people, as long as they're productive and they're not lying around doing nothing." Once again, Jackson was left speechless and appalled by Wright's use of this overtly racist terminology.

### B. Defendants' Proffered Facts

The plaintiff in this case, Keith Jackson, and the individual defendant, Brent Wright, both grew up in Orange County, Virginia. They went to the same high school, and now live within miles of one another. Both of them worked together in the past at another glass installation company. When that company ran into financial trouble, Mr. Wright bought its assets and opened his own glass installation company called BECCM Company, Inc. BECCM fabricates and installs glass store fronts, windows, doors and other items for commercial properties.

In 2008, Mr. Jackson applied with Mr. Wright for a job with BECCM Company, Inc. ("BECCM"). Mr. Wright hired Mr. Jackson to be one of BECCM's lead glass installers. Initially, Mr. Wright paid Mr. Jackson $20.00 per hour, which was the highest wage paid any of BECCM's more than thirty employees. After a short while, Mr. Wright gave Mr. Jackson a raise to $21.00 per hour. Mr. Jackson was then, and remained during the remainder of his time at BECCM, its highest paid lead glass installer.

Mr. Jackson worked as a lead glass installer for BECCM from January 2008 to February 2009. The job of glass installation took place at various commercial properties around central Virginia. Some jobs were in Charlottesville and some were in other locations. Some lead glass installers used their own vehicle to travel to the job sites. Some lead glass installers opted to use one of the company vehicles. No worker was required to use a company vehicle. The company vehicle was not used in, nor required for, the job of glass installation. Rather, the company vehicle was simply a perk that was offered some employees. Because they didn't have to use their own personal vehicle if they didn't want to, lead glass installers received a huge benefit in that they saved literally thousands of dollars a year in gas, wear and tear, and maintenance. The employee's use of the vehicle was of no benefit whatsoever to BECCM, but was rather cost the

company a large amount in depreciation, insurance, maintenance and fuel.  Mr. Jackson chose to use one of the company's vehicles, first a pick up truck, and later a van.

Mr. Jackson was not required to transport anyone to or from worksites.

Mr. Jackson and the other lead glass installers were always paid for the time they worked. Because the lead glass installers were sometimes required to meet in the morning at the Gordonsville traffic circle to receive work-related instructions, BECCM paid for the workers' travel time from the traffic circle to the worksite.  However, Mr. Jackson admitted in depositions that he almost never went to the traffic circle.  Rather, he would just drive straight from his home to either pick up the company vehicle or straight to the worksite.  On each of these days, however, he reported his "start" time to BECCM as the time he left his house.  As a result, Mr. Jackson was overpaid by BECCM by thousands of dollars.  When workers finished their installation work at the end of the day, they were not paid for their travel time back to their homes or if they so chose, to come back to the office.  This was true both for workers who drove their own vehicles and workers who drove company trucks.

For some time, Mr. Jackson was given permission to park the company vehicle at his home in the evenings.  However, when it became apparent that Mr. Jackson was using the vehicle for personal use, BECCM told Mr. Jackson that if he continued to choose to use the company vehicle, and not his personal vehicle, he would have to park it at the company office at the end of the day.  Mr. Jackson chose to continue driving the company vehicle, and at the end of the work day he would park it at the company office.

BECCM Company employs truck drivers and laborers for the specific task of transporting materials and supplies to and from worksites and pays them for performing that

task.  Mr. Jackson is not a truck driver or a laborer who was employed by BECCM Company, Inc. to transport materials and supplies to and from the worksite.

Mr. Jackson worked for BECCM for just over a year.  BECCM did receive some complaints about Mr. Jackson's work performance from supervisors, but, overall, Mr. Jackson's time at BECCM was uneventful until his final days.  On February 11, 2009, Mr. Wright was driving out to the worksite where Mr. Jackson was supposedly working.  At 2:30 in the afternoon, Mr. Wright passed Mr. Jackson driving away from the worksite.  Mr. Wright called Mr. Jackson on his cellphone, and asked him what he was doing.  Mr. Jackson, not aware that Mr. Wright could see him, lied and said he was installing vinyl at the worksite.  When Mr. Jackson reported his time for the day, he reported he had worked until 5:30 p.m.

Mr. Jackson was fired for leaving the worksite early, lying to Mr. Wright, and submitting false time.   In fact, the case before the Court is not a wrongful termination case, and Mr. Jackson admitted at his deposition that he lied and that Mr. Wright had reason to fire him.

During the entire time Mr. Jackson worked for BECCM, he never made any complaints, either orally or in writing.  After Mr. Jackson was fired, he hired his current counsel to represent him in a bid to obtain unemployment.  In those proceedings, for the first time, Mr. Jackson claimed that he was the victim of racial discrimination in the form of a hostile workplace.

Corey Douglas was Mr. Jackson's helper for a substantial period of time.  Mr. Douglas testified at his deposition that he had never heard Mr. Wright use the "n" word.     Defendants deny that Jackson was offered a raise to not vote for Obama, Wright denies he made any of the alleged racial comments, Defendants deny that the alleged racial harassment, comments, jokes or other racial problems occurred and deny that Jackson complained of any racial harassment,

comments, jokes or other racial problem. Defendants deny that any action they took toward

Jackson had any relation whatsoever to his race.

    **C. BECCM's Claim for Conversion**


**III.    THEORIES OF LIABILITY**

**IV.    DEFENSES**


    A.    **Essential elements of defenses**
        BECCM Company, Inc. disputes many of the material facts that plaintiff must prove in order to succeed. As such, BECCM Company's defenses are set forth below in the material facts of its defense.

    B.    **The material facts of the defense**
        1.    FLSA Claims
            a.    Defendants BECCM Enterprises, LLC and Wright are not Jackson's employers for the purposes of the FLSA.
            b.    Jackson was not required to drive a company truck.
            c.    The company truck was not required in the performance of Jackson's work.
            d.    Jackson was not required to transport co-workers.
            e.    Jackson only was required to travel back to the office in the afternoon insofar as he voluntarily chose to partake in the benefit of the company-owned vehicle.
            f.    BECCM Company, Inc. paid Jackson for all of his work.

        2.    Race Claims
            a.    Defendants BECCM Enterprises, LLC and Wright are not Jackson's employers.
            b.    Jackson did not suffer an adverse employment action on account of his race.
            c.    Jackson's allegations about racial comments and jokes in the workplace are false.
            d.    Jackson's allegations about being offered a dollar raise to not vote for Obama are false.
            e.    Jackson was not subject to a racially hostile work environment.
            f.    Jackson did not complain of racial comments and jokes in the workplace to any supervisor, and therefore, BECCM Company, Inc. had no reason to take any corrective action.

       g.     Because Jackson did not complain of racial comments and jokes in the workplace, no action by BECCM Company, Inc. or any other defendant could be retaliation.

       h.     BECCM Company, Inc. did promulgate policies and procedures regarding race in the workplace.

## C.     Theories of the Defense

1.     Employers are not liable to pay employees for their travel to and from work or for activities that occur prior to or after work. Specifically, the Portal-to-Portal Act, 29 U.S.C. § 251 *et seq.* states that:

"... no employer shall be held liable for failure to pay minimum wage or overtime for

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities."

2.     Travel is not transformed into compensable work simply by the employee performing minor preliminary activities before the travel or minor postliminary activities after the travel. The Court in *Reich v. New York City Transit Auth.*, 45 F.3d 646, 651 (2d Cir. 1995) held that the Portal-to-Portal exemptions protect employers from responsibility for commuting time and for relatively trivial, non-onerous aspects of preliminary and postliminary preparation, maintenance and clean up. Without this rule, workers could simply stop by the office for a few minutes on the way home and convert otherwise non-compensable travel into compensable work.

3.     The use of an employer vehicle for travel does not change the legal standard. "[O]therwise non-compensable [travel] is not compensable merely because the employee uses his employer's vehicle." *United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1117 (10th Cir. 1999).

4.     29 CFR § 785.38 states that the travel of workers **required** to return to the main office at the end of the day is compensable. The plaintiff wishes to read this CFR broadly. However, the CFR is not as broad as the plaintiff wishes, and Judge Moon, in denying the plaintiff's motion for summary judgment, applied it narrowly. In short, Judge Moon held that if the vehicle itself is required to do the job, and the employee must therefore drive that vehicle, then a worker who is required to return that vehicle to the office at the end of the day is essentially performing work. This is explained clearly in the case that the CFR itself cites, *Walling v. Mid-Continent Pipe Line Co.*, 143 F. 2d 308 (C. A. 10, 1944). That case involved welders who were required to drive specialized welding trucks to

the worksite and return the trucks at the end of the day. The Court stressed that because the vehicle itself was used in the job, then driving the vehicle was a part of the work duties. This concept is reinforced in many other cases. For instance, in *Burton v. Hillsborough County*, 181 Fed. App. 829, 831 (11th Cir. 2006), public works employees were required to drive vehicles that contained communications equipment, tools and other specialized equipment which the employees used to perform their jobs. Because the vehicle was required to perform their work, the act of returning it to the office at the end of the day was also work. Likewise, in *Baker v. GTE North, Inc.*, 110 F.3d 28, 29 (7th Cir. 1997), employees were required to drive specialized company vehicles that were necessary for the work to be performed, and so travel time was compensable. These cases make it clear to me that the CFR only applies to situations where the vehicle itself is used to complete the job and the employee is required to transport the vehicle to and from the job site.

5.   Where the vehicle is not used for work purposes, even a required return trip to the home office is not compensable. For instance, in *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1289 (10th Cir. 2006), workers were required to travel to and from the work site in a company vehicle. The vehicle wasn't necessary for the job of running the oil rig. The court held that the travel time, even in a company vehicle, and even if such travel was required, was simply travel time and not an integral and indispensable part of their principal activities. The Court held "the Plaintiffs failed to establish that the travel time in and of itself was work for which they must be compensated." Likewise, in *Dolan v. Project Constr. Corp.*, 558 F. Supp. 1308 (D. Colo. 1983), construction workers were required to ride for 15-20 minutes on a company-provided bus to a construction site and then return at the end of the day on the company-provided bus. The workers were required to use the bus service rather than provide their own transportation. The bus itself was not used in the performance of the job. The court ruled that this was simply travel and not "work". Again, in *Knight v. Allstar Bldg. Materials, Inc.*, 2009 U.S. Dist. LEXIS 107247 (M.D. Fla. 2009), even though the plaintiff drove to and from the work site in a company vehicle, where the vehicle was not used for the work itself, and where all of the heavy duty materials were delivered to the job site separately without plaintiff's involvement, the time spent traveling in the vehicle was not compensable. Finally, in *Ralph v. Tidewater Constr. Corp.*, 361 F.2d 806, 808 (4th Cir. 1966), employees were required to spend up to an hour on the company boat to and from the job site. The boat had nothing to do with the work. The Court held that the travel time was not compensable.

6.   A requirement that a company vehicle be returned to the office at the end of the day is not compensable work if the employee had the option of driving his or her own vehicle. For example, in *United Paperworkers Int'l Union, Local No. 30192 v. Riverside Cement Co.*, 1995 U.S. App. LEXIS 13706 (9th Cir. 1995), workers had the option of driving to and from the

job site in company vehicles or using their own vehicle.  Those who chose to ride in the company-provided transportation, had to return to the office at the end of the day.  The court found that travel to and from the site in the company provided vehicles was not an indispensable part of the principle activity for which the employees were hired and thus not compensable.  In *Vega ex rel. Trevino v. Gasper*, 36 F.3d 417 (5th Cir. 1994), Day workers could choose to ride to work on company-provided buses or could use their own vehicles.  The trip lasted two hours each direction.  The travel time was just an extended home-to-work-and-back commute and not compensable.  In *Overton v. Walt Disney Co.*, 136 Cal. App. 4th 263, 271, 38 Cal. Rptr. 3d 693 (2006), employees had the choice of using their own vehicle and being able to go straight home after work or using a company shuttle.  If an employee made the choice of the company shuttle, travel time was not compensable because the use of the shuttle was not a requirement.

7.  Courts have applied the *de minimis* doctrine to exclude from compensation activities that did not take a substantial amount of time.  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692, 90 L. Ed. 1515, 66 S. Ct. 1187 (1946).  The courts have not defined a precise amount of time that may be denied compensation as *de minimis*, but, frequently activities that take 10 minutes or less are considered *de minimis*.  In applying the *de minimis* rule the following considerations are appropriate: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984).

## V.  CONTESTED ISSUES OF LAW REQUIRING RESOLUTION BEFORE TRIAL

There are pending motions in limine to be resolved prior to trial.

## VI.  CONTESTED ISSUES OF LAW NOT REQUIRING RESOLUTION BEFORE TRIAL

A.  NA

## VII.  STIPULATIONS

1.  Keith Jackson will not claim that his marital stress began during his employment with Defendants.

2.  Keith Jackson was properly classified as an employee who was not exempt to the requirements of the Fair Labor Standards Act.

3.  The Motor Carrier exemption contained in § 13(b)(1) of the Fair Labor

Standards Act does not apply to Mr. Jackson.

**VIII.  SPECIAL VOIR DIRE QUESTIONS**

<u>**PLAINTIFF'S PROPOSED** *VOIR DIRE*</u>

1.      Does any member of the jury panel or any member of his or her immediate family know any of the following persons who may testify or whose names may be mentioned during the course of the testimony:

- Keith Jackson
- Melissa Jackson
- Corey Douglas
- Brent Wright
- Jennifer Wright
- Frank Shiflett
- David McDaniel
- Robert Foley
- Joseph E. Lee

2.      The Defendants in this case are BECCM Company, Inc., BECCM Enterprises, LLC, and Brent Wright.   BECCM Company, Inc. trades as Albermarle Glass.  Are you or any members of your family employed by, or have you/they ever done business with, the Defendants?  If so, please state the name of such person, and the nature and extent of the relationship.

3.      Defendants will be represented in Court by:

- John Kitzmann
- Keven Patchett

Do you, or members of your family, either know any of these individuals?  If so, please describe the nature and extent of the relationship.

4.      Excluding domestic matters and excluding traffic matters, have any of you or any members of your immediate family ever been involved in a lawsuit of any kind either as a party

or as a witness? If so, would this fact prevent you from rendering a fair and impartial verdict according to the evidence and the instructions of this Court?

5.  Have any of you, your family members, or close friends, been employed in the legal profession as an attorney, paralegal, legal assistant, judge, law clerk, or other position involving the law?

6.  Have you ever served on a jury before? If so, please describe the nature of the lawsuit, including the type of case.

7.  If it was employment case, what was the result? If the verdict was for the plaintiff, what is the amount that was awarded?

8.  In general, what were your feelings about the experience? Do you believe the result was fair or unfair? Why?

9.  Have you heard of, or do you have knowledge of, the facts or events involved in this case?

10.  Do you believe that the courts should not be involved in wage or employment disputes between employers and their employees?

11.  Have any of you, your family members, or close friends, been employed in a law firm that represents defendants in employment cases?

12.  Have you or anyone close to you ever been accused of discrimination in the workplace?

- If so, briefly describe the situation and how it was resolved.
- How has that experience affected your views about racial discrimination lawsuits?
- If so, would this fact prevent you from rendering a fair and impartial verdict according to the evidence and the instructions of this Court?

13.  Claims of racial discrimination within the hospitality industry are sometimes mentioned in the news:

- Are there cases that you've heard about that you thought were exaggerated or frivolous?   If so, please provide the example.
- Are there cases you've heard about that you thought were important or legitimate? If so, please provide the example.

14.     Have any of you or immediate family members ever owned or operated a small business?

15.     Have any of you or immediate family members ever been employed in a managerial or supervisory capacity?

16.     Have you ever had any Fair Labor Standards Act, or FLSA, training or education?

17.     Have any of you or immediate family members ever been employed in positions involving the areas of personnel, human resources, or equal employment?

18.     Has any member of the jury panel investigated or resolved a workplace dispute between employees such as serving in the capacity of a Human Resource professional?

19.     To what extent do you agree with either of these statements "there is too much litigation in this country" or "jury verdicts in general are too large"?

20.     Do you believe that too many employees sue simply because they are disgruntled on the job?

21.     Do you believe that most employment lawsuits are caused solely by personality conflicts?

22.     Tell us what you do for work and what you like most and least about your job.

23.     Can you think of any fact or circumstances about which you have not been asked that would make it difficult for you to be a fair and impartial juror in this case?

24.     Have you ever worked with or known someone who deserved to be terminated but wasn't because the employer feared being sued?

25.     Have you ever worked with or known someone who deserved to be terminated but instead sued his/her employer?

26.     Does anyone think that employment laws presently make it too difficult for employers to terminate someone's employment?

27.     Does anyone think that juries tend to award too much money in discrimination lawsuits?  If yes, how did you come to that opinion? Do any examples come to mind?

28.     If certain facts are proved at trial, a jury can sometimes award punitive damages. Does anyone feel that punitive damages are unfair, perhaps hurting a business too much and/or providing a windfall to a plaintiff?

29.     Does anyone feel that businesses need protection from punitive damage awards? In other words, does anyone feel that these awards should be capped so that a jury cannot exceed a certain amount?

30.     The defendant's financial means can be considered in determining a punitive damage award.  Does anyone think this might cause juries to award too much money?

Keith Jackson,
*By Counsel*

BECCM Company, Inc., BECCM
 Ent., LLC, and Brent Wright
*By Counsel*


   /s/  Nicholas Woodfield
R. Scott Oswald
VA Bar No. 41770
Nicholas Woodfield
VA Bar No. 48938
*Attorneys for Plaintiff Keith Jackson*
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 331-3911 (tel.)
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com

   /s/  John Kitzmann
John Kitzmann
VA Bar No.
*Attorney for BECCM Company, Inc.,*
*BECCM Ent., LLC, and Brent Wright*
DAVIDSON & KITZMANN, PLC
211 E. High Street
Charlottesville, Virginia 22902
(434) 972-9600 (tel.)
(434) 220-0011 (facsimile)
jhk@dklawyers.com

nwoodfield@employmentlawgroup.com

　　　　 /s/ Keven Patchett
Keven Patchett
VA Bar No.
*Attorney for BECCM Company, Inc.,*
*BECCM Ent., LLC, and Brent Wright*
Skeen Law Offices
258 E. High Street
Charlottesville, Virginia 22902
(434) 293-9664 (tel.)
(434) 293-6690 (facsimile)
kpatchett@skeenlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this the 26th day of July, 2010, a true and correct copy of

the foregoing pleading was served via electronic filing upon:

John H. Kitzmann, Esq.
DAVIDSON & KITZMANN, PLC
211 E. High Street
Charlottesville, Virginia 22902
*Counsel for Defendants*

and

Keven B. Patchett, Esq.
Skeen Law Offices
258 E. High Street
Charlottesville, Virginia 22902
*Counsel for Defendants*

                                       /s/  Nicholas Woodfield
                                   R. Scott Oswald
                                   VA Bar No. 41770
                                   Nicholas Woodfield
                                   VA Bar No. 48938
                                   *Attorneys for Plaintiff Keith Jackson*
                                   THE EMPLOYMENT LAW GROUP, P.C.
                                   888 17th Street, NW, Suite 900
                                   Washington, D.C. 20006
                                   (202) 331-3911 (tel.)
                                   (202) 261-2835 (facsimile)
                                   soswald@employmentlawgroup.com
                                   nwoodfield@employmentlawgroup.com